UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
NYDIA ACOSTA,                      :
                                  :
                                  :
                Plaintiff,        :        04 Civ. 6090 (MBM)
                                  :
        -against-                 :        OPINION AND ORDER
                                  :
JOHN E. POTTER, as Postmaster     :
General of the United States      :
Postal Service, THE UNITED STATES :
POSTAL SERVICE, AMERICAN POSTAL   :
WORKERS UNION, AFL-CIO, and NEW   :
YORK METRO AREA POSTAL UNION APWU, :
AFL-CIO,                          :
                                  :
                Defendants.       :
----------------------------------X

APPEARANCES

JASON M. WOLF
(Attorney for plaintiff)
Wolf & Wolf LLP
910 Grand Concourse, Suite 1F
Bronx, New York 10451
(718) 410-0653

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
JOHN P. CRONAN
Assistant United States Attorney
(Attorneys for defendants John E. Potter
 and the United States Postal Service)
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2779

LARRY CARY
(Attorney for defendant New York
Metro Area Postal Union APWU, AFL-CIO)
Cary Kane LLP
1350 Broadway, Suite 815
New York, New York 10018
(212) 868-6300

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Nydia Acosta sues defendants the United States Postal Service ("USPS") and John E. Potter, as Postmaster General of the United States, for violation of a collective bargaining agreement ("CBA") between the USPS and the American Postal Workers Union, AFL-CIO ("APWU"). Acosta sues defendant New York Metro Area Postal Union APWU, AFL-CIO ("Metro") for breach of the duty of fair representation. Specifically, Acosta alleges that the USPS violated the CBA by not placing her within 28 days in a new duty assignment for which she had successfully bid and by not paying her out-of-schedule pay for the time she continued to work in her old assignment. She alleges that Metro breached the duty of fair representation by permitting the USPS to take longer than 28 days to place her in the new assignment and by then refusing to file a grievance on her behalf. Acosta seeks compensatory damages in the form of out-of-schedule pay for the period January 10, 2004, to March 30, 2004.[1] Acosta also seeks punitive damages. Defendants move for summary judgment

---

[1] During her deposition, Acosta and her attorney stated that she was withdrawing her demand for damages for the period February 28, 2004, to March 26, 2004, and was seeking only regular pay for March 29, 2004, and March 30, 2004. (Decl. of John P. Cronan, Ex. C, Dep. of Nydia Acosta (Acosta Dep.), 183-85) However, the parties never submitted a stipulation of dismissal to this court, nor did Acosta ever move to amend her Complaint. Regardless, modification of Acosta's claims as described in her deposition would not affect the resolution of defendants' summary judgment motion.

pursuant to Fed. R. Civ. P. 56.  Acosta moves to amend her

Complaint to add a claim against the APWU.[2]  For the reasons set

forth below, summary judgment for Metro is granted in part,

summary judgment for the USPS and Potter is granted in part, and

Acosta's motion to amend is granted.


I.

The following facts, viewed in the light most favorable

to Acosta, are relevant to this opinion.

The USPS and the APWU are bound by a national CBA that

has been in force throughout the events that led to this

dispute.[3]  (Decl. of Larry Cary (Cary Decl.), Ex. A, Collective

Bargaining Agreement (Cary CBA))  Although defendants'

submissions do not define clearly the precise nature of the

relationship between the APWU and Metro, Acosta offers no

evidence disputing Metro's assertions that the "APWU . . . is

recognized pursuant to 39 U.S.C. § 1203 as the exclusive

collective bargaining representative nationwide of postal

employees who are postal clerks" and that "Metro . . . is an

---

[2] Acosta named the APWU as a defendant in her original
Complaint, but dismissed it from this action by stipulation
pursuant to Fed. R. Civ. P. 41(a)(ii).

[3] Although the copies of the CBA submitted by defendants
contain an expiration date prior to the events at issue in this
case, defendants have since provided this court with proof of
supplemental agreements extending the CBA through 2006.

autonomous affiliate of the APWU[,] . . . recognized by the
Postal Service as the representative of APWU members and other[]
employees in the APWU bargaining unit of the Postal Service which
are employed in Manhattan, the Bronx and part of New Jersey."
(Pl.'s Resp. to Metro's Statement Pursuant to Local Rule 56.1
(Pl.'s 56.1 Resp. to Metro), ¶¶ 3-4)  That is to say, the APWU is
the national union and the recognized bargaining agent; Metro is
the local.

The CBA provides for a grievance process to resolve
disputes between the USPS and its employees regarding wages,
hours, and conditions of employment. (Cary CBA, art. 15)  This
process includes four "steps" and arbitration, as well as an
opportunity for mediation.  (Id., art. 15.2-15.5)  An employee
may initiate a grievance at Step 1 within 14 days "of the date on
which the employee or the Union first learned or may reasonably
have been expected to have learned of its cause."  (Id., art.
15.2(a))  Alternatively, "[t]he Union . . . may initiate a
grievance at Step 1 within 14 days of the date the Union first
became aware of (or reasonably should have become aware of) the
facts giving rise to the grievance.  In such case the
participation of an individual grievant is not required."  (Id.)
Representatives of Metro are responsible for handling grievances
at Step 1 and Step 2.  (Pl.'s Resp. to the Gov't's Statement
Pursuant to Local Rule 56.1 (Pl.'s 56.1 Resp. to Gov't), ¶ 7)

However, representatives of the APWU handle grievances that proceed beyond Step 2. (Id., ¶ 8; Pl.'s 56.1 Resp. to Metro, ¶ 11)

The CBA allows local unions such as Metro to enter into local memoranda of understanding with the USPS regarding 22 specific matters, so long as the local memoranda are not inconsistent with the CBA and do not vary its terms. (Decl. of Jason M. Wolf (Wolf Decl.), Ex. F., Collective Bargaining Agreement, art. 30.B) Elsewhere, the CBA states the USPS must consult with the APWU at the national level when "a major relocation of employees is planned in major metropolitan areas." (Wolf Decl., Ex. M, Collective Bargaining Agreement (Wolf CBA), art. 12.4.B)

The CBA establishes a bidding procedure for employees seeking to move from their current duty assignments to newly established or vacant assignments. (Cary CBA, art. 37.3) A successful bidder "must be placed in the new assignment within 28 days except in the month of December." (Id., art. 37.3.F.2) The CBA specifies that the "local agreement may set a shorter period." (Id.) When employees must work "outside of their regularly scheduled work week at the request" of the USPS, they are entitled to overtime pay, which is one and one-half times the normal hourly rate. (Id., art. 8.4.A-B)

Acosta has been an employee of the USPS since December

8, 1984, in a variety of positions in several locations.  (Pl.'s
56.1 Resp. to Gov't, ¶ 1)   In December 2003, Acosta worked as a
manual mail processing clerk at the Bronx General Post Office
("Bronx GPO"), sorting mail for the delivery unit called the
Westchester Scheme.  (Aff. of Nydia Acosta (Acosta Aff.), ¶ 2;
Pl.'s 56.1 Resp. to Gov't, ¶ 2)   That job required knowledge
regarding which carriers were responsible for particular
addresses.  (Decl. of John P. Cronan (Cronan Decl.), Ex. E, Dep.
of Leon Smith, 34-35, 55)   The USPS designates many positions by
one of three "tours," each tour encompassing approximately one-
third of the day; Acosta worked on Tour 1, from midnight until
8:30 AM, with Sundays and Mondays off.  (Acosta Aff., ¶ 2; Pl.'s
56.1 Resp. to Gov't, ¶ 3)   From 1984 until December 2003, Acosta
was a member of Metro.  (Pl.'s 56.1 Resp. to Gov't, ¶ 4)   Acosta
terminated her membership in Metro because she was dissatisfied
with one of Metro's shop stewards.  (Pl.'s 56.1 Resp. to Gov't, ¶
4)

On November 25, 2003, representatives of USPS
management met with representatives of Metro to discuss the
USPS's plan to decentralize manual mail processing from the Bronx
GPO to local customer service centers in the Bronx.  (Pl.'s 56.1
Resp. to Gov't, ¶ 12)   Relocation of the work would require the
abolishment of between 66 and 100 duty assignments at the Bronx
GPO, and the creation of a smaller number of assignments at the

local post offices. (Pl.'s 56.1 Resp. to Metro, ¶ 13)  Although

the parties disagree about the exact number of assignments that

had to be abolished, it appears undisputed that the relocation

would create fewer jobs than it abolished.  (Id.)  Employees

whose jobs were being abolished would have to bid for new

positions.  (Pl.'s 56.1 Resp. to Gov't, ¶ 12)

At the meeting on November 25, 2003, the USPS and Metro

reached an oral agreement as to how the relocation would be

carried out and how employees affected by the relocation would

bid on vacant assignments.  (Pl.'s 56.1 Resp. to Metro, ¶ 14)

Although the CBA requires the USPS to place employees in new

assignments within 28 days of a successful bid (Cary CBA, art.

37.3.F(2)), Metro agreed that employees would bid on new

assignments but that the USPS would not have to place the

employees in their awarded assignments until their delivery units

had been transferred out of the Bronx GPO.  (Pl.'s 56.1 Resp. to

Metro, ¶ 14)  In return, the USPS agreed to include approximately

40 "residual vacancies" on the list of assignments available for

bidding, thereby allowing affected employees to bid on more

assignments than the CBA required.  (Id.; Pl.'s 56.1 Resp. to

Gov't, ¶ 16)  Residual vacancies are assignments that have been

put up for bid previously, but that no employee bid on

successfully; normally, the USPS can fill these assignments

without putting them up for bid again.  (Pl.'s 56.1 Resp. to

Gov't, ¶ 16)  This agreement would benefit both the USPS and Metro by allowing the USPS to keep experienced employees at their present assignments until the work had been relocated and by giving employees greater variation in their choice of new assignments.  (Id., ¶¶ 14-18; Pl.'s 56.1 Resp. to Metro, ¶¶ 15-16)  The general terms of the agreement were memorialized in a letter dated December 1, 2003, from James Connolly, Manager of Human Resources for the New York District Office of the USPS, to Clarice Torrence, President of Metro (Cronan Decl., Ex. K), although Metro and USPS officials disagree about whether the agreement required the USPS to place the employees in their new positions by February 28, 2004, at the latest.  (Cary Decl., Ex. H, Dep. of Duline McCoy, 13; Cronan Decl., Ex. D, Dep. of James Connolly, 17-18)

By letter dated December 2, 2003, Acosta received written notice from the USPS that her job was being abolished. (Cary Decl., Ex. K)  The letter informed Acosta that she would remain in her position for a period of 30 days beginning December 13, 2003, and that she should bid for posted vacancies in order to avoid becoming an "unassigned regular employee . . . subject to being assigned to any vacant position for which there was no successful bidder."  (Id.)  On December 8, 2003, a total of 104 duty assignments were put up for bid, including the 41 residual vacancies.  (Pl.'s 56.1 Resp. to Metro, ¶ 18)  Acosta bid on 81

assignments.  (Id.)

On December 12, 2003, USPS and Metro officials met with employees affected by the relocation.  (Pl.'s 56.1 Resp. to Gov't, ¶ 20; Cronan Decl., Ex. C, Dep. of Nydia Acosta (Acosta Dep.), 36-38)  The employees were told that they would be "staying in [their] positions, in the abolished jobs, until the mail went out, and that [they] needed to bid or [they] would be unassigned."  (Acosta Dep., 39)  They were informed that the work would be transferred by units, and that they would receive notice a week before they would have to report to their new assignments. (Id. at 43)  At the meeting, Duline McCoy, Director of the Bronx for Metro, explained that these terms were the result of an agreement between the USPS and Metro.  (Id. at 40-43)  The USPS and Metro officials took questions from the employees, but the only question that Acosta can recall did not involve any of the matters at issue in this case.  (Id. at 43)

Acosta received a letter dated December 30, 2003, from USPS Personnel Services informing her that her new assignment as an automated mail processing clerk would become effective on January 10, 2004.  (Pl.'s 56.1 Resp. to Metro, ¶ 18; Cary Decl., Ex. L)  This new position would be on Tour 3, from 5:00 PM to 1:30 AM, with Saturdays and Sundays off.  (Cary Decl., Ex. L)

Following the instructions given to her at the meeting, Acosta did not report to her new assignment on January 10, 2004.

(Pl.'s 56.1 Resp. to Metro, ¶ 19)  Relying on what she considered a "legitimate" agreement between the USPS and Metro, Acosta never filed or asked Metro to file a grievance on her behalf regarding continuation of her old assignment.  (Id. ¶ 26)  When additional assignments were made available, Acosta again submitted bids in the hope of receiving an assignment with an earlier start time. (Pl.'s 56.1 Resp. to Metro, ¶ 21)

On February 28, 2004, McCoy told Acosta that the agreement between the USPS and Metro had required the USPS to transfer all mail units from the Bronx GPO by that day, and that employees not posted to their new assignments were entitled to out-of-schedule pay from that time on.  (Pl.'s 56.1 Resp. to Gov't, ¶ 34)  McCoy informed Acosta that Metro planned to file a grievance on the employees' behalf.  (Pl.'s 56.1 Resp. to Metro, ¶ 33)  McCoy asked Acosta to fill out a form requesting a change of schedule for personal convenience, although it is not clear how, if at all, doing so related to the grievance.  (Acosta Dep., 75)

Acosta received a letter dated March 10, 2004, from USPS Personnel Services informing her that she had been awarded another Tour 3 assignment as an automated mail processing clerk with a start time of 4:00 PM and Saturdays and Sundays off. (Cronan Decl., Ex. M)  This assignment was to become effective on March 20, 2004.  (Id.)

On Monday, March 22, 2004, Acosta reported to her new Tour 3 duty assignment, even though her unit had not yet moved out of the Bronx GPO. (Pl.'s 56.1 Resp. to Gov't, ¶ 35) Barbara Langhorn, another employee who had successfully bid on the same assignment, also reported for work. (Id.) On Tuesday, March 23, 2004, Acosta heard a rumor that she was supposed to return to her old assignment as a Tour 1 manual mail processing clerk. (Id. ¶ 36) The tour superintendent confirmed that Acosta should return to her former assignment. (Acosta Dep, 91-92) Acosta "wanted it in writing," and the tour superintendent agreed to provide her with written confirmation. (Pl.'s 56.1 Resp. to Gov't, ¶ 36) Acosta worked the rest of the day at her Tour 3 assignment and reported back to that assignment the following day. (Id. ¶¶ 36-37) On Wednesday, March 24, 2004, Acosta again told the tour superintendent that she wanted confirmation in writing. (Acosta Dep., 94) Acosta claims that the tour superintendent promised to get her a letter from USPS Personnel Services, and that she promised in turn to follow Personnel Services' instructions. (Id.) On Thursday, March 25, 2004, Acosta reported to her Tour 3 assignment without incident. (Id. at 95)

On Friday, March 26, 2004, a supervisor on Acosta's Tour 3 assignment gave Acosta a letter signed by Valeria Wooten-

Barnes, Acosta's former supervisor on Tour 1.[4]  (<u>Id.</u> at 95-98)

The letter informed Acosta that "as per agreement with management

and APWU, all manual secondary clerks who are successful bidders

to other assignments are to remain in their manual secondary

positions until the unit is moved out of" the Bronx GPO.  (Cronan

Decl., Ex. N)  The letter then stated, "Your units still remain

in [the Bronx GPO].  Therefore, you should report back to your

secondary unit immediately." (<u>Id.</u>)  Acosta refused to sign in

acknowledgment of receipt because the letter was not from

Personnel Services.  (Acosta Dep., 98-99)  A Tour 3 supervisor

signed and dated the letter, noting that Acosta had read and

refused to sign it. (<u>Id.</u>; Cronan Decl., Ex. N)  At some point in

the evening, Acosta went to complain to Max Rivera, the Assistant

Director of the Bronx for Metro, and Rose Green, a shop steward.

(Acosta Dep., 100)  Langhorn, who had received a similar letter,

accompanied Acosta. (<u>Id.</u>)

---

[4] During Acosta's deposition, the letter was described as being dated March 28, 2004, although it was received and read by Acosta on March 26, 2004.  (Acosta Dep., 96-98)  Yet the letter submitted to this court by the USPS as Exhibit N in the Declaration of John P. Cronan and by Metro as Exhibit R in the Declaration of Larry Cary is dated March 26, 2004.  (Cronan Decl., Ex. N; Cary Decl., Ex. R)  Acosta does not question the authenticity of the letter provided by defendants, nor does she deny that it was indeed this letter that she received on March 26, 2004.  (Pl.'s 56.1 Resp. to Gov't, ¶¶ 38-40; Pl.'s 56.1 Resp. to Metro, ¶ 40)  As long as there is no dispute regarding Acosta's awareness of the letter's content on March 26, 2004, the date appearing on the letter itself is immaterial to the resolution of defendants' motion.

On Monday, March 29, 2004, Acosta reported to her Tour 3 assignment but was not permitted to clock in.  (Id. at 105-06)  She asked Rivera to file a grievance on her behalf, but he told her that she would have to report back to her old assignment on Tour 1 and file a grievance through the shop steward there.  (Id. at 106)  On Tuesday, March 30, 2004, Acosta was again not permitted to clock in at her Tour 3 assignment.  (Id. at 118)  When she complained to Rivera once more, he responded "I told you what you have to do," and walked away.  (Id.)

At some point during these incidents on March 29 and March 30, Acosta contacted McCoy, the Bronx Metro director.  (Pl.'s 56.1 Resp. to Gov't, ¶ 44; Wolf Decl., Ex. H, Dep. of Duline McCoy (McCoy Dep.), 17-18)  McCoy gave Acosta the same advice that Rivera had.  (Pl.'s 56.1 Resp. to Gov't, ¶ 44)  Acosta also sent McCoy a letter postmarked March 30, 2004.  (McCoy Dep., 17)  However, McCoy refused to sign for this letter, and it was returned to Acosta.  (Id. at 17-18; Cary Decl., Ex. )

Acosta never reported back to her Tour 1 assignment.  (Acosta Dep., 121)  As of March 31, 2004, she went on leave under the Family Medical Leave Act, because of "stress created by the conditions at work."  (Pl.'s 56.1 Resp. to Gov't, ¶ 46)  After five weeks on leave, by which time Acosta's unit had been moved out of the Bronx GPO, Acosta returned to work at her Tour 3 assignment.  (Id.)

On March 30, 2004, Acosta filed unfair labor practice charges against the USPS and Metro with the National Labor Relations Board ("NLRB"). (Cronan Decl., Ex. O; Cary Decl., Ex. M) The charge against the USPS stated:

> Since on or about March 29, 2004, [the USPS] refused to permit Nydia Acosta to clock in at the position she bid and was awarded effective March 20, 2004, in retaliation for her protected concerted activities and because of her activities on behalf of APWU/New York Metro Branch. (Cronan Decl., Ex. O)

The charge against Metro stated:

> Since on or about February 28, 2004, and continuing, [Metro] has failed and refused to file a grievance on behalf of Nydia Acosta regarding the refusal of the [USPS] to allow her to report to work at Tour 3 Automation, a position [for which] she was a successful bidder, for arbitrary and invidious reasons. (Cary Decl., Ex. M)

On April 9, 2004, Acosta amended her charge against Metro to refer specifically to her exchanges with Rivera and the returned letter she had sent to McCoy. (Cary Decl., Ex. N) She also claimed that she had asked Rivera to file a grievance for out-of-schedule pay dating back to January 10, 2004. (Id.)

A letter dated July 22, 2004, from the NLRB Office of the General Counsel notified Acosta that her appeal from the Regional Director's refusal to issue a complaint in her case had been denied. (Cary Decl., Ex. O) The letter stated that investigation had not revealed any violation of the National Labor Relations Act by Metro. (Cary Decl., Ex. O) The letter informed Acosta that, in fact, Metro had filed and settled a

grievance on her behalf "asserting that [the USPS] improperly reassigned [her] and another employee."  (Id.)

Unbeknownst to Acosta, the grievance referred to in the letter from the NLRB had been appealed to Step 2 of the CBA grievance procedure by the shop steward on Acosta's Tour 1 assignment.  (Cary Decl., Ex. P; Pl.'s 56.1 Resp. to Gov't, ¶ 48) A letter to the shop steward dated May 20, 2004, confirmed a settlement according to which Acosta and Langhorn would be "paid out of schedule premium for the hours worked when they returned to Tour 1, after they worked on their bidded assignment, and before they were re-assigned back to their Tour 3 bid assignment."  (Cary Decl., Ex. V)

Also unbeknownst to Acosta, a class action grievance regarding the USPS's failure to post employees to their new assignments by February 28, 2004, had been appealed to arbitration by Metro on July 21, 2004.  (Cary Decl., Ex. S)  On June 30, 2005, the USPS and the APWU agreed not to pursue arbitration because the "[t]he issue [was] moot."  (Letter From Larry Cary Dated December 20, 2005, Ex. B)  Peter Coradi, the APWU's National Business Agent, signed the agreement on behalf of the APWU.  (Id.)

The Postal Reorganization Act of 1970 provides that "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees . . . may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy." 39 U.S.C. § 1208(b) (2000). This section of the Postal Reorganization Act tracks the language in section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a)[5]; therefore, case law governing the latter applies to the former. See Bowen v. U.S. Postal Serv., 459 U.S. 212, 232 & n.2 (1983) (White, J., concurring in part in the judgment and dissenting in part); Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 766 F.2d 715, 720 (2d Cir. 1985); Miller v. U.S. Postal Serv., 985 F.2d 9, 10 n.1 (1st Cir. 1993).

Although formally comprised of two separate causes of action, a suit in which an employee alleges that an employer has breached a CBA and that a union has breached its duty of fair representation by failing to enforce the CBA is known as a "hybrid § 301/fair representation claim." DelCostello v. Int'l

---

[5] The text of 29 U.S.C. § 185(a) reads: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy."

Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983); Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 33-34 (2d Cir. 2000).  This label is used because, when a CBA contains a binding grievance and arbitration process, an employee cannot avoid the private dispute resolution mechanism simply by suing her employer in court.  See DelCostello, 462 U.S. at 163-64.  The "judicial forum will still be open" only if the employee can show that either failure to pursue the grievance process or the unsuccessful result thereof was "due to the Union's wrongful conduct, that is, a breach of its duty to represent plaintiff fairly."  Young v. U.S. Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990); see also Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567 (1976) (holding that the breach must "seriously undermine[] the integrity of the arbitral process" to overcome the finality of a CBA's binding grievance procedure).

A union's duty of fair representation is implied under the scheme of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq.  See DelCostello, 462 U.S. at 164 & n.14; Carrion, 227 F.3d at 33.  The duty of fair representation marks the outer boundary of a union's broad discretion to represent members of a bargaining unit.  Because the NLRA allows "a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a

minority union as their representative," <u>DelCostello</u>, 462 U.S. at

164 n.14, it is the duty of the exclusive bargaining agent

invested with this authority "to serve the interests of all

members without hostility or discrimination toward any, to

exercise its discretion with complete good faith and honesty, and

to avoid arbitrary conduct," <u>id.</u> (quoting <u>Vaca</u> v. <u>Sipes</u>, 386 U.S.

171, 177 (1967)) (internal quotation marks omitted).  This duty

"applies to all union activity," whether the activity involves

contract administration, enforcement, or negotiation.  <u>Air Line</u>

<u>Pilots Ass'n, Int'l</u> v. <u>O'Neill</u>, 499 U.S. 65, 67, 76-77 (1991).

An inquiry into whether a union has breached the duty

of fair representation by acting either arbitrarily, in bad

faith, or discriminatorily is context-specific and fact-

sensitive.  Courts "are not necessarily left with shifting ad hoc

standards to be fashioned anew in each case, but [they] do have

broad parameters of judgment that necessarily vary from context

to context."  <u>Ryan</u> v. <u>N.Y. Newspaper Printing Pressmen's Union</u>

<u>No. 2</u>, 590 F.2d 451, 455 (2d Cir. 1979).  A union's actions are

arbitrary "only if, in light of the factual and legal landscape

at the time of the union's actions, the union's behavior is so

far outside a 'wide range of reasonableness' as to be

irrational."  <u>Air Line Pilots Ass'n, Int'l</u>, 499 U.S. at 67

(quoting <u>Ford Motor Co.</u> v. <u>Huffman</u>, 345 U.S. 330, 338 (1953))

(citation omitted).  A union's actions are in bad faith "when it

acts with an improper intent, purpose, or motive"; bad faith "encompasses fraud, dishonesty, and other intentionally misleading conduct." <u>Spellacy</u> v. <u>Airline Pilots Ass'n-Int'l</u>, 156 F.3d 120, 126 (2d Cir. 1998). And although a union may not discriminate among employees based on improper factors such as race or union membership, <u>see</u> <u>Humphrey</u> v. <u>Moore</u>, 375 U.S. 335, 357 (1964); <u>Jones</u> v. <u>Trans World Airlines, Inc.</u>, 495 F.2d 790, 797 (2d Cir. 1974), "the union had broad discretion to adjust the demands of competing groups within its constituency," <u>Ryan</u>, 590 F.2d at 455 (quoting <u>Jones</u>, 495 F.2d at 798) (internal quotation marks omitted).

Because a union's breach of the duty of fair representation "is a prerequisite to consideration of the merits of plaintiff's claim against" an employer for breach of a CBA, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the union has acted arbitrarily, in bad faith, or discriminatorily. <u>Young</u>, 907 F.2d at 307. The converse is also true –- that is, in a hybrid claim, if the employer is not liable to the employee, neither is the union. <u>See</u> <u>DelCostello</u>, 462 U.S. at 165 ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.") However, not all allegations that a union has breached the duty of fair representation are constituent parts of a hybrid

claim, and some may provide the basis for an independent fair representation claim. See generally White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559-62 (6th Cir. 1990) (discussing when plaintiffs can bring independent fair representation claims). In Lewis v. Tuscan Dairy Farms, Inc., 25 F.3d 1138 (2d Cir. 1994), the Second Circuit affirmed a determination by the District Court that the union had acted in bad faith, but vacated the Court's ruling that the employer was also liable, remanding and ordering the Court "to address the issues raised by [the employer's] arguments that the [CBA] was orally amended and that, in any event, it was entitled to rely on [the union president's] apparent authority to modify it." Id. at 1145. Thus, it appears that when an employer can show that action otherwise in breach of a CBA is the result of reliance on the authority of a union to modify the CBA, the employer is not in breach and the employee's claim against the employer is not inextricably tied to the claim against the union.[6] The suit is not a hybrid claim even though

---

[6] Lewis is suggestive rather than definitive because the Second Circuit couches its analysis in jurisdictional terms –– that is, whether the District Court would maintain jurisdiction over the fair representation claim if the employer did not breach the CBA. See Lewis, 25 F.3d at 1145. However, the Circuit's final word on the matter was that "bad-faith concealment of the oral agreement violated the duty of fair representation regardless of whether [the employer] is liable for breach of contract." Id. This statement, as well as the entire discussion of jurisdiction, would have been unnecessary if the union could not have been liable for breach of the duty of fair representation as an automatic consequence of the employer's exoneration.

styled as such, and the employee may proceed against the union alone with respect to those union actions that led to the employer's reliance on the modification.[7]

## III.

A.  Acosta's Allegations Against Metro

The discussion below considers whether there are any disputed issues of material fact that prevent judgment for Metro as a matter of law with respect to Acosta's allegations that Metro violated the duty of fair representation.  After considering all of Metro's actions implicated in Acosta's Complaint, I conclude that the only portion of Acosta's claim against Metro that can survive the motion for summary judgment concerns whether the grievance filed on Acosta's behalf regarding the days she was not permitted to clock in at her Tour 3 assignment shows that Metro acted arbitrarily or in bad faith.

---

The court would maintain jurisdiction over the independent fair representation claim as "a civil action . . . arising under [an] Act of Congress regulating commerce."  28 U.S.C. § 1337(a); see Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No.6, 493 U.S. 67, 83-84 (1989).

[7] As discussed below, there are still disputed issues of material fact regarding the USPS's breach.  Thus, although I discuss Lewis to present a full account of the law regarding hybrid claims in this Circuit, I need not decide now which, if any, of Acosta's allegations against Metro would survive if it turns out that the USPS did not breach the CBA.

1. <u>The Oral Agreement</u>

Acosta argues that by entering into and then continuing to abide by the November 25, 2003, agreement with the USPS, Metro violated the duty of fair representation. This argument seems to contain three components: (i) negotiating the agreement without consulting the national union was in violation of Metro's authority under the CBA; (ii) the specific terms of the agreement were arbitrary; and (iii) Metro acted in bad faith by concealing the agreement from the employees. Acosta's argument fails on all three.

a. <u>Metro's Authority To Enter Into the Agreement</u>

Acosta insists that Metro did not have the authority to enter into the agreement with the USPS. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Mem.), 7-9; Pl.'s 56.1 Resp. to Gov't, ¶ 23; Aff. of Patrick Delessio, ¶¶ 3, 8) Acosta focuses on the CBA provision requiring the USPS to consult with the APWU at the national level when "a major relocation of employees is planned in major metropolitan areas" (Wolf CBA, art. 12.4.B), and she emphasizes that Metro has not cited a specific CBA clause that gave it the authority to enter the agreement. (Pl.'s Mem., 7-8; Pl.'s 56.1 Resp. to Gov't, ¶ 23) I agree that there is a disputed question of fact as to whether Metro should have consulted with the APWU before entering into the agreement. The answer depends on whether the decentralization of units from

the Bronx GPO met the criteria of "a major relocation of employees," as well as on whether the CBA's restrictions on local memoranda of agreement prohibit ad hoc arrangements of the type seen here. However, I need not resolve these issues -- nor do they foreclose summary judgment -- because they are immaterial to the fair representation claim.

A union does not violate the duty of fair representation merely because it erroneously oversteps its contractual authority. See Ryan 590 F.2d at 455-56 ("Certainly a breach of the underlying agreement between the [employers] and the Union . . . would not alone constitute the kind of arbitrary or irrational action prohibited under the cases; this was an emergency situation not really envisaged in the collective bargaining agreements.") Equating a union's failure to abide by the terms of a CBA with breach of the union's duty of fair representation would nullify the Supreme Court's holding in United Steel Workers of America, AFL-CIO-CLC v. Rawson, 495 U.S. 362 (1990), which limited the circumstances in which an employee can sue a union directly for breach of a CBA. The Rawson Court stated that the duty of fair representation is a "purposefully limited check" on a union's power and that "[i]f an employee claims that a union owes him a more far-reaching duty, he must be able to point to language in the collective-bargaining agreement specifically indicating an intent to create obligations

enforceable against the union by the individual employees." Id.
at 374. Acosta has pointed to no such language. Therefore, the
duty of fair representation is all that Metro owed Acosta when
arriving at the agreement with the USPS. The dispute over
Metro's authority to enter into the agreement is immaterial
unless Acosta can connect the exercise of that disputed authority
with some other arbitrary, bad faith, or dicriminatory act.

> b. The Terms of the Agreement

Acosta attacks repeatedly the substantive terms of the
November 25, 2003, agreement. She states that the "affected
employees were forced to remain in positions which were abolished
and did not receive a penny for it." (Pl.'s Mem., 9) She also
claims that "she was able to bid on positions other than [the]
residual vacancies" and "[t]herefore, the conception that the
Postal Service was doing plaintiff and her colleagues a favor is
a misnomer." (Pl.'s 56.1 Resp. to Gov't, ¶ 16) Finally, she
alleges that because her new assignment was as an automated mail
processor, "whether or not the mail units [from the Bronx GPO]
reached her [at the new assignment] was irrelevant." (Id., ¶ 18)
I interpret these comments to be an argument that the agreement
was arbitrary, and I find that this argument fails.

The Supreme Court's test for arbitrariness -- which
requires that a union behave irrationally -- is difficult to
meet. See Air Line Pilots Ass'n, Int'l, 499 U.S. at 67. This

court's "substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." Id. at 78. "As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage." Barr v. United Parcel Serv., Inc., 868 F.2d 36, 43-44 (2d Cir. 1989) (quoting Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 645 (2d Cir. 1985), overruled on other grounds by Lorance v. AT&T Tech., 490 U.S. 900 (1989) (quoting Capobianco v. Brinks, Inc., 543 F. Supp. 971, 975 (E.D.N.Y. 1982), aff'd mem., 722 F.2d 727 (2d Cir. 1983))) (internal quotation marks omitted).

Even if Acosta's critique of the agreement between Metro and the USPS provides an accurate assessment both of its contents and the reasons she is unhappy with it, this assessment does not demonstrate irrationality. The affected employees did not receive additional compensation for remaining in their abolished assignments, but the USPS did agree to put more assignments up for bid than necessary. Although Acosta was able, even absent the agreement, to bid on assignments other than the added residual vacancies, the agreement provided the employees as a whole with increased flexibility. Assuming it is true that Acosta's new assignment in automation did not depend on the

transfer of her old manual assignment's unit, her knowledge remained vital to the functioning of that unit until the unit was moved out of the Bronx GPO.  Thus, the agreement created a rational plan for decentralization with minimum disruption both to the lives of employees and to mail delivery.  Its terms were not arbitrary, and Metro did not breach the duty of fair representation by agreeing to them.

   c.  <u>Disclosure of the Agreement</u>

    Acosta's final allegation regarding the agreement is that Metro acted in bad faith by concealing it from the employees.  (Pl.'s Mem., 9)  Yet the undisputed facts reveal none of the "intentionally misleading conduct" necessary to sustain a determination of bad faith, <u>Spellacy</u>, 156 F.3d at 126, and Acosta presents no evidence suggesting an "improper intent, purpose, or motive."  <u>Id.</u>  Metro officials informed the affected employees of the agreement at a meeting on December 12, 2003, and gave the employees an opportunity to ask questions about the agreement at that time.  (Acosta Dep., 36-43)  Acosta never claims that Metro lied to the employees about what the agreement entailed or that Metro had some ulterior motive for entering into the agreement. Rather, she asserts that "the fact that [Metro] waived penalty out of schedule premium pay . . . without even informing the employees that this was occurring is indicative of . . . malfeasance."  (Pl.'s Mem., 9)  In other words, Metro should not

have waited until after the agreement was reached to tell the employees about it.  Yet this delay does not by itself rise to the level of bad faith behavior, as a comparison of the facts in Acosta's case with those in <u>Lewis</u> v. <u>Tuscan Dairy Farms, Inc.</u> reveals.

In <u>Lewis</u>, the Second Circuit held that a union acted in bad faith because it concealed from employees a secret oral agreement sacrificing seniority rights but assured the employees that they would receive the benefits that had been traded away. <u>Lewis</u>, 25 F.3d at 1140, 1142-43.  Moreover, the union president's decision to enter into the agreement was motivated in part by the impact it would have on his prospects for reelection, and he discouraged the employees whose interests would be hurt from finding new jobs.  <u>Id.</u> at 1140.  In stark contrast, Acosta provides no evidence that Metro misled employees into believing they would be placed in their new assignments within 28 days or that they would receive out-of-schedule pay if not.  Nor does Acosta point to any improper motive on Metro's part.  All she claims is that Metro waited almost three weeks to inform the employees of the agreement, which does not by itself constitute bad faith.

Because the undisputed facts establish that Metro did not breach its duty of fair representation in agreeing to allow the USPS to defer placing the employees in their new assignments

26

without penalty, Metro's motion for summary judgment is granted with respect to that portion of Acosta's claim seeking damages for work performed between January 10, 2004, and February 27, 2004, the last day on which Metro officials claim the agreement was valid.

### 2. The Class Action Grievance

With respect to the time period February 28, 2004, to March 26, 2004, Acosta's suit mirrors the class action grievance that Metro appealed to arbitration on July 21, 2004. Acosta has not alleged any facts that suggest Metro's handling of the grievance was arbitrary, in bad faith, or discriminatory. Although McCoy instructed Acosta to fill out an apparently irrelevant form in preparation for the grievance, Acosta does not claim that this request played any role in the processing or the outcome of the grievance. See Hines, 424 U.S. at 567 (specifying that a causal relationship must exist between the breach and subversion of the private dispute resolution mechanism); Young, 907 F.2d at 307 (same). Even if Metro never mentioned the grievance to Acosta again, failure to keep an employee apprised of a grievance's progress is not a breach of the duty of fair representation. See Caputo v. Nat'l Ass'n of Letter Carriers, 730 F. Supp. 1221, 1230 (E.D.N.Y 1990). It is true that the APWU's decision not to proceed to arbitration might constitute a breach of the duty of fair representation, but there is no

evidence that Metro or its agents were involved at this stage in the process.[8]  Thus, Metro's motion for summary judgment is granted with respect to that portion of Acosta's claim seeking damages for work performed between February 28, 2004, and March 26, 2004.

### 3.  Acosta's Complaints to Rivera and McCoy

Acosta argues that Rivera's refusal to file a grievance on her behalf and McCoy's refusal to accept her letter after she was prevented from clocking in on March 29, 2004, and March 30, 2004, were breaches of the duty of fair representation.  (Compl., ¶ 28)  The undisputed facts reveal that neither Rivera's nor McCoy's actions were arbitrary, in bad faith, or dicriminatory.

As Acosta admits, Rivera's refusal to file a grievance on her behalf was accompanied by instructions to return to her Tour 1 assignment and bring her grievance through the shop steward there.  (Acosta Dep., 106; Pl.'s 56.1 Resp. to Gov't, ¶¶ 44-45)  Even if, as Acosta claims, Rivera had the power to initiate the grievance himself (Acosta Dep., 106), his treatment of Acosta's complaint did not overstep the bounds of union discretion established by the duty of fair representation.  There is nothing in the law that restricts a union's ability to prescribe the manner in which employees must file grievances any

---

[8] I address below Acosta's motion to reinstate the APWU as a defendant.

more than it restricts a union's tactical freedom in pursuing those grievances.  Just as "any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous," Barr, 868 F.2d at 43, a decision requiring an employee to abide by management's wishes in order to initiate a grievance might seem unfair to an individual whose grievance turns out to be meritorious.  Just as "[t]actical errors are insufficient to show a breach of the duty of fair representation," id., this retrospective unfairness does not signify breach of the duty of fair representation unless the legal and factual context in which the decision was made reveals that it was arbitrary, in bad faith, or discriminatory.

Here, Acosta does not claim that Rivera discriminated against her by treating her different from the way he treated Langhorn or any other employee in similar circumstances.  Nor does Acosta allege any facts that taint Rivera's instructions with arbitrariness or bad faith.  Acosta concedes that employees who disobey direct orders from their supervisors are subject to disciplinary measures that can include being fired.  (Acosta Dep., 119)  Thus, Rivera's instruction that Acosta go back to Tour 1 in order to file her grievance displays prudent caution in the face of potential penalties for insubordination.  Acosta's denial that she was given a direct order because the letter from

Wooten-Barnes contained the word "should" and not "must" (id. at 119-20) does not negate the union's discretion to err on the side of caution when an employee's job might be at stake. Nor does it impute an improper bad faith motive to Rivera. Therefore, Rivera's refusal to file a grievance for Acosta was not a breach of the duty of fair representation.

For similar reasons, McCoy's refusal to sign for Acosta's letter was not a breach. As with Rivera, Acosta claims not that McCoy ignored her complaint, but that McCoy instructed her to bring her grievance in a particular manner. (Pl.'s 56.1 Resp. to Gov't, ¶ 44) The duty of fair representation does not obligate union officials to accept every communication from employees at all times and in all forms, and the mere fact that McCoy did not accept Acosta's letter after telling her how to proceed with her grievance is not evidence of arbitrariness, bad faith, or discrimination.

4. The Grievance Referred to in the NLRB Letter

The materials provided to this court reveal only one reason why summary judgment for Metro should not be granted in full. Acosta does not mention this reason, but it is a staple of summary judgment jurisprudence that a court is "obligated to search the record and independently determine whether or not a genuine issue of fact exists." Bayway Refining Co. v. Oxygenated Marketing and Trading A.G., 215 F.3d 219, 225 (2d Cir. 2000)

(quoting _Jiminez_ v. _Dreis & Krump Mfg. Co._, 736 F.2d 51, 53 (2d

Cir. 1984) (quoting _Higgins_ v. _Baker_, 309 F. Supp. 635, 639

(S.D.N.Y. 1970))) (internal quotation marks omitted).  Although

Metro filed a separate grievance on behalf of Acosta and Langhorn

that purports to cover the events of March 29, 2004, and March

30, 2004, and although that grievance seems to have resulted in a

rational, non-discriminatory settlement, the appeal to Step 2

contained an obvious misstatement of fact.  Not only did the

appeal leave out that Acosta was prevented from clocking in when

she reported to Tour 3, but it also stated affirmatively that

both Acosta and Langhorn returned to their Tour 1 assignments

when told to do so.  (Cary Decl., Ex. P)  Although a union does

not breach the duty of fair representation through mere

negligence or errors in judgment, _Barr_, 868 F.2d at 43-44, a

blatantly inaccurate rendering of the facts underlying a

grievance seems to cross the line into arbitrariness or bad

faith.  Metro might still show that it fudged the facts to

prevent disciplinary action against Acosta for not returning to

Tour 1, or it might show that the misstatement had no effect on

the outcome of the grievance process, even though the

misstatement easily could have led those who processed the

grievance to reach a settlement that awarded relief only for time

actually worked on Tour 1.  But these are questions of disputed

fact that I do not consider at this time.  Thus, the portion of

Acosta's claim against Metro seeking damages with respect to
March 29, 2004, and March 30, 2004, survives Metro's motion for
summary judgment.

B.  Acosta's Allegations Against the USPS

        I now address whether the above analysis of Acosta's
claim against Metro requires judgment as a matter of law for the
USPS and whether there are other disputed questions of material
fact regarding the USPS's alleged reliance on Metro's authority
to modify the CBA.

        1.  <u>January 10, 2004, to February 27, 2004</u>

        Because Acosta cannot show that Metro breached the duty
of fair representation for this time period, she fails to meet
the prerequisite necessary to proceed against the USPS for breach
of the CBA.  Thus, the USPS's motion for summary judgment with
respect to these dates is granted.

        2.  <u>February 28, 2004, to March 26, 2004</u>

        a.  <u>Acosta's Motion To Amend</u>

        Even though the only surviving portion of her claim
against Metro relates to March 29, 2004, and March 30, 2004,
Acosta's motion to amend her Complaint prevents me from granting
summary judgment for the USPS with respect to the time period
February 28, 2004, to March 26, 2004.  Acosta dismissed the APWU
from this suit with prejudice in a stipulation of dismissal

signed by me on May 9, 2005.  She now seeks to reinstate the APWU as a defendant based on its decision not to arbitrate the class action grievance seeking out-of-schedule pay for employees who had not been placed in their new assignments by February 28, 2004.  Leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  I grant Acosta's motion (i) because the APWU's decision not to arbitrate appears to be distinct from the union behavior that Acosta claimed was a breach of the duty of fair representation in the original Complaint, and (ii) because the reason given for not proceeding to arbitration –– that "[t]he issue [was] moot" –– makes no apparent sense unless all of the affected employees had received out-of-schedule pay or some other consideration for days worked in their old assignments after February 28, 2004.  Thus, Acosta's amendment raises an inference of arbitrariness or bad faith, and might provide the prerequisite breach of the duty of fair representation necessary for Acosta to succeed on her claim against the USPS for the relevant time period.  Defendants retain the right to challenge this amendment under Acosta's earlier stipulation of dismissal.

> b.  The USPS's Reliance on Metro's Authority To Modify the CBA

The USPS argues that, even if Acosta can show the prerequisite breach of the duty of fair representation, the USPS did not violate the CBA because it relied upon Metro's authority,

actual or apparent, to modify the CBA. This argument implicates
disputed issues of material fact that foreclose summary judgment.
First, the CBA provisions that prohibit local unions from
negotiating plans for certain major relocations of employees and
from entering into local memoranda of agreement in conflict with
the CBA create questions of fact regarding whether Metro had
actual or apparent authority to enter into the oral agreement and
whether the USPS was entitled to rely on Metro's authority to
enter into such an agreement. Although these questions are not
relevant to Metro's breach of the duty of fair representation for
the reasons explained above, they are material with respect to
the USPS's claim of reasonable reliance on Metro's authority.
Second, there is a question of fact regarding whether the oral
agreement extended beyond February 28, 2004. Metro officials
insist that it did not. If this position is correct, then there
was no contract modification for the USPS to rely upon after that
date. Thus, the USPS's motion for summary judgment is denied
with respect to that portion of Acosta's claim seeking damages
for work performed between February 28, 2004, and March 26, 2004.

### 3. <u>March 29, 2004, and March 30, 2004</u>

As discussed above, Acosta's claim against Metro
relating to March 29, 2004, and March 30, 2004, survives the
summary judgment stage. Because Acosta can still satisfy the
prerequisite breach of the duty of fair representation and

because there are disputed issues of material fact surrounding the USPS's reliance on the oral agreement, the USPS's motion for summary judgment is denied with respect to these two days as well.

\*       \*       \*

For the reasons set forth above, Metro's motion for summary judgment is granted in part, the USPS and Potter's motion for summary judgment is granted in part, and Acosta's motion to amend is granted. Thus, the following claims are now before this court: (i) Acosta's hybrid claim that the APWU breached its duty of fair representation with respect to the time period February 28, 2004, to March 26, 2004, and that the USPS violated the CBA during this period and (ii) Acosta's hybrid claim that Metro breached its duty of fair representation with respect to March 29, 2004, and March 30, 2004, and that the USPS violated the CBA on these days.

The parties will attend a conference on Thursday, February 9, 2006, to schedule further steps in this litigation.

SO ORDERED:

Dated:   New York, New York
         January 25, 2006

Michael B. Mukasey
U.S. District Judge

35